UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11471-RGS

FUNDQUEST INCORPORATED

v.

TRAVELERS CASUALTY AND SURETY COMPANY
and ST. PAUL MERCURY INSURANCE COMPANY

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

June 4, 2010

STEARNS, D.J.

Plaintiff FundQuest Incorporated brought this lawsuit in Suffolk Superior Court alleging a common-law claim for breach of contract (Count I) and a violation of the Massachusetts Consumer Protection Act (Mass. Gen. Laws ch. 93A, § 11) (Count II). On September 3, 2009, defendants Travelers Casualty and Surety Company and St. Paul Mercury Insurance Company (collectively Travelers) removed the case to federal court on diversity grounds. Travelers moved for summary judgment on February 4, 2010. FundQuest filed a cross-motion for summary judgment on March 1, 2010. A hearing was held on May 27, 2010.

BACKGROUND

The relevant facts are not in dispute. On January 16, 2007, FundQuest hired John Curran as a full-time "maintenance specialist."[1] Def.'s Statement of Facts (SOF) ¶ 1. On August 15, 2007, Curran submitted a request to switch the direct deposit of his paycheck

---

[1] According to counsel at oral argument, the job title describes a lower level Information Technology support position.

from Sovereign Bank to an account at Bank of America.  In processing Curran's direct deposit request, Cindy Joyce, a FundQuest human resources employee, mistakenly inserted the payroll information of FundQuest's founder, President, and Chief Executive Officer, Robert Del Col.[2]  As a result, Del Col's bi-weekly paycheck began to be deposited into Curran's Bank of America account as of August 30, 2007.  Curran did not notify FundQuest that he was receiving Del Col's appreciably larger paycheck.  Instead, he complained of not receiving his own.  FundQuest responded by adding Curran's bi-weekly pay to the direct deposit without deducting Del Col's salary.  Curran collected both salaries until October 31, 2007, when he quit working at FundQuest.  His pay stopped following his resignation, but he continued to receive Del Col's.  Curran never notified FundQuest (or anyone else) of the ongoing error.

On January 16, 2009, Del Col woke up to the fact that he had not been paid for some sixteen months.  FundQuest promptly reimbursed Del Col the amount he was owed in back salary ($258,964.27).  In the interim, Curran had received thirty-three deposits intended for Del Col.  Most of them, twenty-eight in total, were deposited after Curran left FundQuest.

FundQuest attempted to recover the sums mistakenly paid to Curran through a Financial Institution Bond issued by Travelers on October 30, 2008.[3]  SOF - Ex. A.  On February 18, 2009, FundQuest submitted a Proof of Loss in the amount of $258,964.27,

---

[2]The clerical error occurred when Joyce selected Del Col's name (the default option as the longest-tenured FundQuest employee) instead of Curran's in the company's software.  SOF - Ex. C.

[3]Because under section 3 of the Bond, the date of a loss is the date of its discovery, there is no dispute as to whether the Bond was in effect.

the total of the errant "salary" paid to Curran.[4]  SOF ¶ 19.  On April 3, 2009, Travelers agreed to pay $39,066.05, less the $10,000 deductible set out in the Bond, for a total of $29,066.05. SOF ¶ 20.  The offered amount reflected the sum wrongly paid to Curran while he was employed at FundQuest, but not the sum he received thereafter.  SOF ¶ 20.  On May 7, 2009, FundQuest's attorneys sent a Chapter 93A demand letter to Travelers seeking the full loss amount.  Compl. ¶ 20.  On June 11, 2009, Travelers rejected the demand, and instead issued a check to FundQuest in the amount of $29,066.05.  Compl. ¶ 21.  FundQuest filed this lawsuit on July 27, 2009, seeking the balance of the claim ($219,898.22), treble damages, costs, and attorney's fees.[5]

## DISCUSSION

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986).

---

[4]On March 23, 2009, Fundquest also filed a criminal complaint against Curran. Compl. ¶ 18.  It is not altogether clear that Curran in fact committed a larceny.  See Commonwealth v. Hays, 80 Mass. 62, 65 (1859).

[5]The Complaint incorrectly states that the amount in dispute is "$259,964.27 (minus $29,066.65 already received by check)."  Compl. at 8.  This amount overstates the loss claimed by $1,000 and does not take the $10,000 deductible into account.  FundQuest makes clear in its summary judgment papers that it agrees that the correct amount at issue is $219,898.22.  Pl.'s Mem. at 1, 5.

The issue before the court is whether Travelers correctly interpreted the Bond as limiting its liability to less than the full amount of the claim. FundQuest argues that it is entitled to the full amount under either the "employee dishonesty/theft" or the "misplacement" provision of the Bond.

The rules governing the construction of an insurance contract are well established. "[W]e construe the policy 'according to the fair and reasonable meaning of its words,' interpret exclusionary clauses against the insurer, and resolve all ambiguities against the insurer. These tasks of contract interpretation, including the determination of ambiguity or its lack, are matters for the court." U.S. Aviation Underwriters, Inc. v. Fitchburg-Leominster, Flying Club, Inc., 42 F.3d 84, 86 (1st Cir. 1994), quoting Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, 324 (1991).[6] If the court determines an insurance term to be ambiguous, its interpretation is a question for the finder of fact.[7] Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981). The issue will almost always turn on the parties' intent, Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 211 (1st Cir. 1996), as manifested in the policy language read as a whole, while construing the disputed words in

---

[6]The Bond is a negotiated contract, thus the usual rules disfavoring the insurer where a pre-printed form agreement is contested do not apply. FDIC v. Ins. Co. of N. Am., 105 F.3d 778, 786-787 (1st Cir. 1997) ("The presumption against the insurer is not applied where the policy language results from the bargaining between sophisticated commercial parties of similar bargaining power.").

[7]"[L]ack of ambiguity is a relative status, not an absolute one. The parties need not choose phraseology which invariably excludes every possible interpretation other than the one they intend. . . . [I]t is sufficient if the language employed is such that a reasonable person, reading the document as a whole and in realistic context, clearly points toward a readily ascertainable meaning." Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1085 (1st Cir. 1989). "Definitions of ambiguity require examination of the language *employed*, not the language omitted." Stop & Shop Cos., Inc. v. Fed. Ins. Co., 136 F.3d 71, 74 (1st Cir. 1998) (emphasis in original).

their usual and ordinary sense. Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc., 346 F.3d 259, 261 (1st Cir. 2003).

I.     Breach of Contract

"To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." Guckenberger v. Boston Univ., 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted). To establish a breach, plaintiff has the burden of proving the failure of the defaulting party to conform to one or more of the contract's material terms. A term is material when it involves "an essential and inducing feature" of the contract. Buchholz v. Green Bros. Co., 272 Mass. 49, 52 (1930). "Though questions of materiality are usually to be determined by the trier of fact, . . . the rule is not universal. As is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994) (cognate Rhode Island law).

    a.     Dishonesty/Theft

In the claim submitted to Travelers on February 18, 2009, FundQuest completed section I of the Proof of Loss form that provides for "employee dishonesty or employee theft claims." SOF - Ex. B at 2. Insuring Agreement A to the Bond provides that Travelers will indemnify FundQuest for:

> (A) Loss resulting from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

>>(a) to cause the Insured to sustain such loss; and
>
>>(b) to obtain financial benefit for the Employee and which, in fact, result in obtaining such benefit.

Insuring Agreement B to the Bond provides that Travelers will indemnify FundQuest for:

>(B)(1) Loss of Property resulting directly from
>
>> * * * *
>
>>(b) theft, false pretenses, common-law or statutory larceny, committed by a person present in an office or on the premises of the Insured,
>
>while the Property is lodged or deposited within offices or premises located anywhere.

Travelers interprets the employee dishonesty/theft provision of the Bond to cover only the mistaken deposits made during Curran's tenure as an employee of FundQuest and to exclude those made after he resigned.[8] Travelers acknowledges that its argument distinguishing acts committed before an employee's termination from those occurring after he leaves employment raises an issue of first impression in Massachusetts. Travelers relies on a Seventh Circuit case, <u>Cont'l Corp. v. Aetna Cas. & Sur. Co.</u>, 892 F.2d 540 (7th Cir. 1989), in which a corrupt manager (Maciejewski) at a title insurance company (American) was found to have executed a real estate fraud scheme by issuing fraudulent title insurance policies. Before the scheme was discovered, the manager left the title insurer to work for a competitor (Safeco). There he promptly implemented the same scheme. The facts then become complicated, but at the end of the day, the competitor

---

[8]"Employee" is defined by the Bond to mean "a natural person in the service of the Insured at any of the Insured's offices or premises covered hereunder whom the Insured compensates directly by salary or commissions and whom the Insured has the right to direct and control while performing services for the Insured." Bond § 1(e)(1).

brought a racketeering conspiracy suit against the title insurer, arguing that it had been complicit in the fraud. The title insurer's parent company (Continental) settled the case and then sought indemnification from the defendant insurer (Aetna) for the losses it attributed to the acts of the corrupt employee.

The Seventh Circuit rejected a decision of the district court ordering indemnification. The bond at issue in Cont'l Corp. contained language similar to that in the FundQuest Bond: "The terms of the bond provide coverage only for losses 'resulting directly from' the dishonest or fraudulent acts of an *American employee*, and defines 'employee' to include only persons 'employed in, at, or by any of the Insured's offices, and who are compensated . . . and whom the Insured has the right to control." 892 F.2d at 548 (emphasis in original). In agreeing with Aetna's decision not to pay on the bond, the Seventh Circuit gave short shrift to the parent company's "rather unconvincing" causation theories, including the argument that it was entitled to reimbursement for the costs of settling the Safeco litigation.

> Aetna argues that the district court erred in denying its summary judgment motion on this aspect of the case because, as a matter of law, the Safeco-related losses were outside the coverage provided under the bond. We agree, Safeco's alleged injuries did not occur when Maciejewski was an American employee; thus, we cannot conclude that the Safeco settlement "result[ed] *directly* from" Maciejewski's conduct as an American employee, as required by the terms of the bond. . . . Safeco's injuries, as alleged in the complaint, resulted from fraudulent Safeco title policies and commitments issued by Maciejewski *while he was an employee of Safeco*, not American. Each of these transactions occurred several months after Maciejewski had terminated his employment at American.

Id. (emphasis in original).  Travelers argues that because each of Curran's misappropriations of a deposit constituted a "separate and distinct" dishonest act, the facts are "[j]ust as in Continental." Def.'s Mem. at 9.  The court disagrees.[9]

There is a significant and determinative factual distinction.  Unlike the manager in Cont'l Corp., there is no evidence that Curran committed any affirmative act after leaving FundQuest that compounded or aggravated the loss.[10]  The acts that gave life to the machinery that caused the loss – Curran's direct deposit request and Joyce's error – occurred while Curran was still an employee of FundQuest.  The only affirmative act he committed at FundQuest – requesting the redirection of the deposit of his own paycheck – was not itself "dishonest or fraudulent."  His dishonest passivity – maintaining his silence after learning that he was receiving a grossly inflated paycheck – began at FundQuest and simply continued uninterrupted after he left.[11]

FundQuest further maintains that it is entitled to reimbursement under the "single loss" definition of the Bond, as its loss is attributable to a single set of acts or omissions,

---

[9]Travelers also cites U.S. Fid. & Guar. Co. v. Empire State Bank, 448 F.2d 360 (8th Cir. 1971), and Bay Ridge Air Rights, Inc. v. Franklin Nat'l Bank, 404 N.Y.S.2d 22 (N.Y. App. Div. 1978), for further support.  Both cases are inapposite.  In Empire State Bank, the Eighth Circuit affirmed that there was neither a loss nor any dishonest act attributable to an ex-employee's conduct post-termination.  448 F.2d at 367.  Bay Ridge does not contain any pertinent facts which would allow a comparison with this case.

[10]Cont'l Corp. can be further distinguished by Travelers' attorney's acknowledgment at the hearing that Curran's behavior was not a "scheme" in the sense of being a premeditated plot or conspiracy involving Joyce, the hapless payroll clerk.

[11]Travelers suggests that each time Curran drew on the mistakenly-delivered funds, an act of fraudulent conversion (or embezzlement) occurred.  The crime of embezzlement, however, requires the receipt of the property in trust, which is not the case here.  See Commonwealth v. Mills, 51 Mass. App. Ct. 366, 373-374 (2001), aff'd, 436 Mass. 387, 396 (2002).

all of which occurred while Curran was an employee.[12]  Section 4 of the Bond defines "single loss" as follows.

> Single Loss means all covered loss, including court costs and attorney's fees . . . resulting from
>
> * * * *
>
> (b) any one act or series of related unintentional or negligent acts or omissions on the part of any person (whether an Employee or not) resulting in damage to or destruction or misplacement of Property, or
>
> (c) all acts or omissions other than those specified in (a) and (b) preceding, caused by any person (whether an Employee or not) or in which such person is implicated . . . .

Travelers for its part argues that FundQuest is attempting to expand the "single loss" definition to cover claims never contemplated by the Bond.  The court disagrees.  It is telling that Travelers in processing the FundQuest claim read the "all acts and omissions" clause of section 4(c) to encompass each of the misdirected deposits Curran received *while an employee of FundQuest* to constitute a single unitary loss.  As Travelers succinctly states: "This is evidenced by the fact that Travelers only charged one deductible when paying that portion of the claim which Travelers agrees is covered by the Bond."  Def.'s Opp'n at 3-4.  In other words, had Travelers interpreted the "acts or omissions" clause to define each errant deposit as a separate and distinct act, it would have claimed a deductible of $50,000 ($10,000 against each of the five deposits made while Curran was

---

[12]An analogy might be drawn to the environmental insurance context in which policy exclusions regularly distinguish between sudden and accidental discharges (a discrete event) and the scope of any resulting harm incrementally accrued over time as a result. See, e.g., Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 407 Mass. 675, 680-681 (1990).

employed at FundQuest) rather than the $10,000 deductible it assessed against the five deposits collectively.[13]

b. Misplacement

As an alternative theory of coverage, FundQuest argues that the deposits are a loss attributable to employee "misplacement" under the Bond because of Joyce's clerical error.[14] Insuring Agreement B to the Bond provides that Travelers will indemnify FundQuest for:

(B)(1) Loss of Property resulting directly from

    (a)    robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof,

\* \* \* \*

while the Property is lodged or deposited within offices or premises located anywhere.[15]

Travelers makes several arguments objecting to FundQuest's misplacement theory: fidelity bonds cover dishonest acts rather than misplacement during routine operations; property is not considered "misplaced" if an insured knows where it went; the loss was attributable solely to Curran's dishonesty rather than Joyce's mistake, and so on. It is unnecessary for the court to address these arguments because the misplacement claim

---

[13]To the extent the "single loss" definition might be considered ambiguous, the intent of the parties can be interpreted by their own actions, in this case Travelers'. See Restatement (Second) of Contracts § 202 cmt. g (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

[14]Although FundQuest prevails on its first theory, for completeness I will briefly address the "misplacement" alternative, as the argument can be quickly disposed of.

[15]The "single loss" definition at section 4(b) of the Bond also references misplacement as a cause of insured loss.

fails for the simple reason that it was waived.  When FundQuest submitted its Proof of Loss to Travelers, it made a claim only for an employee dishonesty/theft loss.  SOF - Ex. B at 2.  Section II of the Proof of Loss form providing for "all other claims" was left blank, including a checkbox for "Mysterious Disappearance/Misplacement."  Id.  Section 5 of the Bond requires any claim to be submitted within six months of the discovery of a loss.  It is undisputed that FundQuest did not submit a claim for misplacement prior to July of 2009.[16]

II.     Massachusetts Consumer Protection Act (Mass. Gen. Laws ch. 93A)

FundQuest additionally seeks damages for violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 11.  An insurer's failure to make a reasonable offer of settlement when issues of liability are clear may constitute an unfair and deceptive business practice within the meaning of Chapter 93A, § 2.  Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 564 (2001).  "To be held unfair and deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 620 (1994).  "An act or practice may be 'unfair' within the statutory meaning [of Mass. Gen. Laws ch. 93A,  §§ 2 and 11] without being deceptive or fraudulent."  Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc., 403 Mass. 722, 729 (1989).

Inherent in an insurance contract is the insurer's duty of good faith in its dealings with its insured.  Sarnafil, Inc. v. Peerless Ins. Co., 418 Mass. 295, 303-304 (1994).  Mass.

---

[16] The misplacement theory is not raised in the Complaint, and only first appears in FundQuest's memorandum arguing in support of summary judgment.

Gen. Laws ch. 176D, § 3(9), defines certain "claim settlement practices" as unfair and deceptive. This includes "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). "In order to determine whether liability is 'reasonably clear,' the fact finder must determine 'whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff.'" Nyer v. Winterthur Int'l, 290 F.3d 456, 461 (1st Cir. 2002), quoting Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass. App. Ct. 955, 956-957 (1995). While Mass. Gen. Laws ch. 93A, § 11, does not in so many words incorporate Mass. Gen. Laws ch. 176D § 3(9), it is established law that a violation of the latter statute may constitute actionable conduct under the former.[17] R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 435 Mass. 66, 78 (2001).

The obligation of an insurer concerning settlement is to act in good faith. DiMarzo v. Am. Mut. Ins. Co., 389 Mass. 85, 97 (1983). A negligent failure to settle where a prudent insurer would have settled is sufficient to establish liability. Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 120 (1994). An insurer, however, is not required "to put a fair and reasonable offer on the table" until liability and damages are apparent. Bobick v. U.S. Fid. & Guar. Trust Co., 439 Mass. 652, 659 (2003), quoting Hopkins, 434 Mass at 564. If an insurer has "a reasonable and good faith belief that it is not obligated to make a payment to a claimant" and takes active steps to resolve any dispute, it is not

---

[17]In a Mass. Gen. Laws ch. 93A, § 11 context, a showing that an unfair or deceptive act was a proximate cause of a loss of money or property is an essential element of the action. Mass. Farm Bureau Fed'n, 403 Mass. at 730; Walsh v. Chestnut Hill Bank & Trust Co., 414 Mass. 283, 290 n.7 (1993). Section 11 (unlike section 9) does not create an independent right to recover damages for violations of Mass. Gen. Laws ch. 176D § 3(9), that are not also shown to have been in violation of Mass. Gen. Laws ch. 93A, § 2. Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 754 (1993).

liable even if its action is "ultimately held to be based on a misinterpretation of the law." Premier Ins. Co. of Mass. v. Furtado, 428 Mass. 507, 510 (1998). "A plausible, reasoned legal position that may ultimately turn out to be mistaken – or simply, as here, unsuccessful – is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D." Guity v. Commerce Ins. Co., 36 Mass. App. Ct. 339, 343 (1994).

Travelers argues that Chapter 93A damages are not warranted because it has asserted a "reasonable and plausible interpretation of the Bond." Def.'s Mem. at 11, citing Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 15 (1989) ("In good faith, Commercial Union relied upon a plausible, although ultimately incorrect, interpretation of its policy. There is nothing immoral, unethical or oppressive in such an action."). Accord RLI Ins. Co. v. Wood Recycling, Inc., 2006 WL 839514, at *5 (D. Mass. Mar. 30, 2006) ("[P]olicy interpretation fell within the realm of the 'plausible, though ultimately incorrect.'"); Peterborough Oil Co. v. Great Am. Ins. Co., 397 F. Supp. 2d 230, 244-245 (D. Mass. 2005) ("Great American's interpretation of the exclusion was incorrect, but it was hardly unreasonable. Its position was supported by case law, and did not ignore either the clear terms of the policy language or any salient facts.").

FundQuest responds that the plain terms of the Bond made clear that the entire loss was covered and that the common-law duty of loyalty owed by employees to their employer should have made clear to Travelers that Curran's conversion of funds was a dishonest act under the Bond. The duty of loyalty argument is irrelevant since Travelers has never denied that Curran's behavior was a dishonest act. Nor is the text of the Bond as limpid as FundQuest would have it. FundQuest has been unable to marshal any case law supporting its interpretation of the Bond, while the one case of seeming relevance, Cont'l

13

Corp., arguably points in the other direction. Despite Travelers' ultimately erroneous interpretation of the Bond, the court does not believe that its actions rise to the level of bad faith, or that a reasonable insurer could not have deemed the issue one open to reasonable debate, particularly given the court's own struggle to see through the insurance-ese in which the Bond is written. Compare Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 36 (1st Cir. 2007) (expressing doubt, but affirming that a reasonable person would "probably" have concluded that insurer was liable where it changed its legal argument twice instead of admitting error and extending a settlement offer).

## ORDER

For the foregoing reasons, FundQuest's motion for summary judgment is ALLOWED as to its breach of contract claim. It is DENIED as to the Chapter 93A claim. Travelers' cross-motion for summary judgment is DENIED as to the breach of contract claims. It is ALLOWED as to the Chapter 93A claim. As the prevailing party, FundQuest shall file within ten (10) days of the date of this decision a proposed Form of Final Judgment for the court's approval.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE